**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | |
|---|---|
| JANE DOE (J.A.S.) an individual,<br><br>*Plaintiff,*<br><br>v.<br><br>G6 HOSPITALITY, LLC; G6 HOSPITALITY IP, LLC; G6 HOSPITALITY PROPERTY, LLC; G6 HOSPITALITY PURCHASING, LLC; G6 HOSPITALITY FRANCHISING, LLC; MOTEL 6 OPERATING, LP; and RADHESHVAR, LLC<br><br>*Defendants*. | CIVIL ACTION NO.9:24-cv-00195<br><br>JURY TRIAL DEMANDED |

**PLAINITFF'S ORIGINAL COMPLAINT**

Jane Doe (J.A.S.), Plaintiff in the above-styled and numbered cause, files this Original Complaint against G6 HOSPITALITY, LLC; G6 HOSPITALITY IP, LLC; G6 HOSPITALITY PROPERTY, LLC; G6 HOSPITALITY PURCHASING, LLC; G6 HOSPITALITY FRANCHISING, LLC; MOTEL 6 OPERATING, LP; and RADHESHVAR, LLC, as Defendants, and would respectfully show the Court and jury as follows:

**SUMMARY**

1. Jane Doe (J.A.S.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a

commercial sex act through force, fraud, or coercion.[1] Traffickers use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

3. Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

4. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7. As discussed herein, Defendants derived a financial benefit from facilitating sex trafficking by providing ventures where traffickers could exploit victims, including victims like Jane Doe (J.A.S.), with minimal risk of detection or interruption.

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] 18 U.S.C. §1591(e)(3).

8. Defendants continued supporting traffickers, including Jane Doe (J.A.S.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotel and specifically at the Motel 6 located at 2820 Chamblee Tucker Rd, Atlanta, GA 30341. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking. Accordingly, Jane Doe (J.A.S.) files this lawsuit.

## PARTIES

9. Plaintiff, Jane Doe (J.A.S.) is a resident of Georgia. She may be contacted through her lead counsel, whose information is contained below. She may be contacted through her lead counsel, whose information is contained below.

10. Jane Doe (J.A.S.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

11. Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (J.A.S.).

12. Defendant G6 Hospitality LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, Texas 75201.

13. Defendant G6 Hospitality IP, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, Texas 75201.

14. Defendant G6 Hospitality Property, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, Texas 75201.

15. Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, Texas 75201.

16. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, Texas 75201.

17. Defendant Motel 6 Operating, LP is a for-profit Delaware company with its principal place of business in Carrolton, Texas. It may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 400, Dallas, Texas 75201.

18. Defendants G6 Hospitality LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, LP, will collectively be referred to as "G6," "G6 Defendants," or "Franchisor Defendants." Upon information and belief, they owned, operated, controlled, and/or managed the following Franchisee location:

a. Radheshvar, LLC d/b/a Motel 6, located at 2820 Chamblee Tucker Rd., Atlanta, GA 30341.

19. Radheshvar, LLC is a for profit limited liability company with its principal place of business in Georgia. It may be served through its registered agent Rupa Patel at 285 Country Club Dr, Stockbridge, GA 30281. Radheshvar, LLC will be referred to as a "Franchisee Defendant." At all relevant times, Defendant Radheshvar, LLC owned, operated, controlled,

and/or managed the Motel 6 hotel located at Motel 6, located at 2820 Chamblee Tucker Rd., Atlanta, GA 30341.

## JURISDICTION AND VENUE

20. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

22. All G6 Defendants have the same principal place of business, which is in Carrolton, Texas, within the Eastern District of Texas. Therefore, each of the G6 Defendants is a resident of the Eastern District of Texas for the purpose of § 1391(b)(1).

23. Under 28 U.S.C. § 1391(c)(2), Franchisees are residents of Texas for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over each Franchisee.

24. Under § 1391(d), Franchisees are residents of Texas for the purpose of § 1391(b)(1) because, if the Eastern District of Texas was a separate state, Franchisee's contacts with the district would be sufficient to subject it to personal jurisdiction.

25. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Texas.

26. Plaintiff's claims against Franchisees arise out of Franchisees' contacts with Texas through Franchisees' relationship with the G6 Defendants, which have their principal place of business in the Eastern District of Texas. Franchisee's participation in a venture with the G6 Defendants operating the subject motels occurred, in substantial part, in Texas because:

a. Upon information and belief, Franchisees actively sought out a franchising relationship by contacting the G6 Defendants in Texas;

b. Franchisees acknowledged that the negotiation, execution, and acceptance of the franchising agreement occurred in the Eastern District of Texas;

c. Franchisees agreed that its ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas;

d. The franchising agreements had a choice of law provision selecting the law of Texas as the governing law;

e. The franchising agreements required Franchisees to report information to the G6 Defendants in Texas, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like Jane Doe (J.A.S.);

f. Franchisees agreed to submit all notices required under the franchising agreement to the G6 Defendants in the Eastern District of Texas;

g. Franchisees were required to attend training and meetings in Texas;

h. The G6 Defendants dictated policies related to safety, security, human trafficking, employee training and Franchisee's response, as well as other subjects from their principal place of business in the Eastern District of Texas;

i. Franchisees had an ongoing obligation to participate in centralized programs operated by the G6 Defendants from their principal place of business in the Eastern District of Texas;

j. Franchisees were required to purchase insurance on behalf of one or more Texas entities (the G6 Defendants);

k. Upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by G6 from its principal place of business in Texas;

l. Upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by Franchisor in Texas;

m. The benefit that Franchisees received from room rentals was governed by the Texas franchising agreement;

n. Franchisees agreed to make all payments due under the franchising agreement at the G6 principal place of business in the Eastern District of Texas;

o. Franchisees' operation of the subject motels was controlled and/or influenced by many policies set and enforced by the G6 Defendants from their principal place of business in Carrollton, Texas; and

p. Franchisees signed a software licensing agreement with the G6 Defendants for the property management software the G6 Defendants required Franchisees to use when operating the motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms. Franchisees agreed to file any lawsuit arising from the licensing agreement in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## STATEMENT OF FACTS

### I. Jane Doe (J.A.S.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendants.

27. Jane Doe (J.A.S.) is a survivor of sex trafficking. Her trafficking began around January of 2012 and continued through December 2017.

28. Jane Doe (J.A.S.) met her trafficker in 2012 when she was beginning what she believed to be a modeling career, having no reason or knowledge to suspect that she would be forced into sex trafficking. However, from January 2012 to December 2017 Jane Doe (J.A.S.) was forced to engage in commercial sex acts numerous times a day by her trafficker who would physically and mentally abuse her and be assaulted by johns she was forced to engage in commercial sex acts with.

29. Jane Doe (J.A.S.) did not want to engage in commercial sex acts but when she tried to leave, her trafficker would beat her and threaten her. Her trafficker engaged in a pattern of control and intimidating and threatening behavior that caused Jane Doe (J.A.S.) to believe she would face serious harm or physical restraint if she did not comply with their ongoing demand that she engage in commercial sex for his financial benefit.

30. Jane Doe (J.A.S) was not allowed to keep any of the money she made.

31. At various times between January 2014 and December 2015, Jane Doe (J.A.S.) was trafficked at the Motel 6 property located at 2820 Chamblee Tucker Rd., Atlanta, GA 30341 (the "Subject Motel 6").

32. Jane Doe (J.A.S.)'s sexual exploitation repeatedly occurred in rooms of the Subject Motel 6 and was facilitated by the G6 Defendants.

33. Between January 2014 and December 2015, Jane Doe (J.A.S.) was trafficked an incalculable number of times at the Subject Motel 6 through force, fraud and coercion.

## II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

34. While the widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Franchisor Defendants and Franchisee Defendant knew or should have known regarding the trafficking at their hotel properties, trafficking activity, including the trafficking of Jane Doe (J.A.S.), was pervasive and apparent at the location at issue.

35. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[3] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[4] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[5] Hotels have been found to account for over 90 percent of commercial exploitation of children.[6]

---

[3] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*

[4] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[5] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[6] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

36. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[7]

37. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

38. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

b. Individuals show signs of physical abuse, restraint, and/or confinement;

c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

---

[7] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*,_https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

e. Individuals lack freedom of movement or are constantly monitored;

f. Individuals avoid eye contact and interaction with others;

g. Individuals have no control over or possession of money or ID;

h. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i. Individuals have few or no personal items—such as no luggage or other bags;

j. Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k. A group of girls appears to be traveling with an older female or male;

l. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n. Possession of bulk sexual paraphernalia such as condoms or lubricant;

o. Possession or use of multiple cell phones; and

p. Possession or use of large amounts of cash or pre-paid cards.[9]

39. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[10] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

40. The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that

---

[9] *Id.*

[10] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

most individuals involved in prostitution are subject to force, fraud, or coercion.[11] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

41. The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[12]

42. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

43. All Defendants were specifically aware that commercial sex in a hotel environment, involving a "pimp," implicitly involves to sex trafficking. Defendants received training and guidance on this. Defendants knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that reasonable diligence required treating signs of commercial sex activity, particularly with apparent and obvious involvement of a "pimp," as evidence of sex trafficking. Reasonable diligence required Defendants to avoid benefiting from the rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims

[11] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[12] *Id.*

44. The most effective weapon against sexual exploitation and human trafficking is education and training.[13] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[14]

45. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[15] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

46. Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

47. There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash

---

[13] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[14] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[15] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

48. Defendants' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking.

49. Each of the G6 Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

50. Unfortunately for Jane Doe (J.A.S.), Defendants' promises have proved empty time and again. While Defendants' statements reflect actual knowledge of the problem of sex trafficking at their branded hotels, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and receiving benefits from that trafficking. Defendants have made the choice, at all levels, to respond inadequately to their knowledge regarding sex trafficking in their hotels. Instead, Defendants have actively chosen to continue to benefit from sex trafficking of victims like Jane Doe (J.A.S.).

### III. Sex Trafficking Has Long Been Prevalent at Motel 6 Branded Properties, and Defendants Have Known About It.

51. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (J.A.S.)'s trafficking, that sex trafficking was ongoing and widespread at Motel 6 branded properties including the Subject Motel 6 named herein.

52. Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[16]

53. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los Angeles.[17] G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

54. The settlement required the G6 Defendants to change policies that were facilitating sex trafficking.[18] Based on information and belief, G6 has failed to adequately implement and enforce such changes.

55. G6 intentionally ensures its hotels are "strategically located . . . close to airports, freeways, and other thoroughfares" making them attractive venues for trafficking and compelled prostitution.[19]

---

[16] https://traffickinginstitute.org/wp-content/uploads/2022/01/2018-Federal-Human-Trafficking-Report-Low-Res.pdf; https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf

[17] *Motel 6 pays $250,000 to settle human trafficking suit* (Aug. 31, 2017), https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/.

[18] *Id.*

[19] *Motel 6 – An Iconic American Brand*, https://g6hospitality.com/our-brands/#about-motel-six (last visited Aug. 10, 2023).

56. Public statements of the G6 Defendants confirm that they knew that sex trafficking is a problem in the hotel industry and that they retained control over the response of their branded hotels to this problem. The G6 Defendants recognize that "“[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests.”[20] They also acknowledged the significant role G6 has in the three D's: **deterring, detecting,** and **disrupting sex trafficking** in their branded hotels.[21]

**a. Sex Trafficking at Motel 6 Branded Hotels was well Known by Defendants**

57. Upon information and belief, each of the Defendants monitored criminal activity occurring at Motel 6 branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel property where Jane Doe (J.A.S.) was trafficked.

58. Scores of news stories from across the US highlight G6's facilitation of sex trafficking and certainly establish that Defendants knew, or should have known, of the use of Motel 6 hotels for sex trafficking.

59. Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. Among notable press involving the frequent use of Motel 6 hotels for illegal activity, the following was noted:

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten (10) times per day.[22]

---

[20] *G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING*, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf
[21] *Id*.
[22] Amy Fine Collins, *Sex Trafficking of Americans: The Girls Next Door,* Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.

- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[23]
- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[24]
- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[25]
- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[26]
- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[27]
- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California.[28]
- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[29]
- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[30]
- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[31]

---

[23] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.
[24] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html.
[25] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download.
[26] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.
[27] *FBI Investigates Human Trafficking At Madison Hotel,* WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.
[28] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.
[29] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity/.
[30] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.
[31] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

- Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[32]

- In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[33]

- In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[34]

- A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[35]

- In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[36]

- A local law enforcement investigation resulted in the rescue of a fifteen (15) year old runaway in February 2015, from a Motel 6 near the Oakland, California airport where she was being sex trafficked.[37]

- In North Charleston, South Carolina, a seventeen (17) year old girl was rescued in March 2015 from a Motel 6 by special agents from the United States Department of Homeland Security. The girl was sold for sex, beaten, and starved by a sex trafficker.[38]

---

[32] Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/.

[33] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel,KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172.

[34] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

[35] Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-22city/21922915/.

[36] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.

[37] Emilie Raguso, Woman Charged In Berkeley Teen Sex Trafficking Case (Dec. 8, 2015), https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-case.

[38] Melissa Boughton, Police Say Teen Starved, Beaten at North Charleston Hotel; Man Arrested in Sex-Trafficking Case (Mar.2, 2015), https://www.poastandcourier.com/archives/police-say-teen-starved-beaten-at-north-charleston-motel-man/article_032153eefcb6-5333-9182-926a7f43dfbf.html.

- Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[39]

- In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[40]

- Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[41]

- Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[42]

- In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[43]

- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[44]

- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[45]

- In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[46]

---

[39] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[40] Amanda Milkovits, Massachusetts Man Accused of Trafficking Teen In Warwick Motel, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[41] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police, The Washington Post (Apr. 28, 2015),https://www.washingpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[42] Hsing Tseng, Seven Indicted by Colorado Grand Jury In Child Sex Trafficking Ring Bust, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex- trafficking-ring-bust/.

[43] Andrea Fisher, Woman Caught Up In Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads-guilty/89566374/.

[44] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, Herald Net (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[45] Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen, News Mississippi (Nov. 7, 28 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

[46] Matt Fountain, Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.

- In November 2015 a man was arrested at a Motel 6 in Ventura, California and was criminally charged with sex trafficking a fifteen (15) year old girl who was found with him.[47]

- In November 2015 a man was arrested at a Motel 6 in Ventura, California and was criminally charged with sex trafficking a fifteen (15) year old girl who was found with him.[48]

60. These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at G6 branded hotels. Moreover, on information and belief, the G6 Brand Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

61. Upon information and belief, each of the G6 Brand Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific property where Jane Doe (J.A.S.) was trafficked.

62. Reviews of Motel 6 Branded properties, which upon information and belief each of the G6 Brand Defendants, monitored regularly, also show both the pervasiveness of sex trafficking at its branded properties and the G6 Brand Defendants' knowledge of the same. For example:

- 2010 TripAdvisor review from Maine states "[M]y tour group and I figured that we should just stay here considering we were only staying here one night...There was dirtbags hanging around the pool area, and in the little yard area on the side. It looked as if all of the people who LIVED THERE were on drugs by the way they talked! Also during my stay there we saw a prostitute who must have been living there! She looked anorexic and came into the lobby telling the receptions that the cops might be coming so tell her if they show up! (i am not making any of this up) there was also "a security guard" there waiting in the lobby all day and throughout

[47] Fresno Man Sentenced To Prison For Pimping, Human Trafficking In Ventura County, Ventura County Star (Apr. 26, 2016), https://www.vcstar.com/story/news/local/communities/ventura/2016/04/26/fresno-man-sentenced-to-prison-for-pimping-human-trafficking-in-ventura-county/88714698/.
[48] Fresno Man Sentenced To Prison For Pimping, Human Trafficking In Ventura County, Ventura County Star (Apr. 26, 2016), https://www.vcstar.com/story/news/local/communities/ventura/2016/04/26/fresno-man-sentenced-to-prison-for-pimping-human-trafficking-in-ventura-county/88714698/.

the night making sure that the prostitute did not leave. They told the receptionist that the prostitute had 2 clients upstairs..."[49]

- 2011 Yelp review from California states "…We paid to spend two nights, but after one night of being terrorized by pimps, prostitutes, "druggies" and homeless sleeping in cars we checked out…Our lasting memory should be the beautiful wedding, but instead it will be know as our night of terror. The management is well aware of this and contribute to the problem by renting rooms to these terrorist..."[50]

- 2011 TripAdvisor review from California states "…After watching the pedestrian and vehicle traffic for a period of time in the immediate area, it is apparent that the staff does not decline service to prostitutes w/ their protection (pimps) and drug dealers...While the affordable rates are the draw, once your there, you'll realize that Corporate hasn't paid attention to what occurs there or doesn't care as long as the money keeps coming in."[51]

- 2011 Yelp review from California states "Sheets and towels are frequently stained. Prostitution is a problem at this location, leading me to believe management and the staff (who are very friendly with the hookers) turns a blind eye to it to fill rooms or is being paid to look the other way…"[52]

- 2012 TripAdvisor review from Colorado states "…The first night, I received phone call after phone call, asking if I wanted "sexual favors" done to me. NO!!!!!! I also witnessed numerous drug dealings going on, and had my door banged on several times…Upon checkout, I explained issues to the clerk (the same person who checked me in) and she said, oh well…"[53]

- 2012 Yelp review from Texas states "Do not stay here. Just stayed here and had some shadey stuff goin on…for one the hotel is a front for a prostitution ring the owners are running…I turned down one of the girls who in which called my room phone and asked if I wanted company and soon after had one with purple hair and what looked like her pimp at my door. I didn't answer I just watched through the peep hole. after they knocked for about 5 mins they left. As soon as I got comfortable I hear someone messing with my door and I look through the peep hole and they are back and are trying to use a key.. woooow..."[54]

- 2012 Yelp review from California states "what to say about the "no tell motel sex" lol sad but true...my neighboor had people as in men in and out all night long if you

---

[49] https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_Danvers-Danvers_Massachusetts.html.
[50] https://www.yelp.com/biz/motel-6-santa-rosa-south-santa-rosa.
[51] https://www.tripadvisor.com/Hotel_Review-g32810-d78752-Reviews-Motel_6_Oakland_Airport-Oakland_California.html.
[52] https://www.yelp.com/biz/motel-6-salinas.
[53] https://www.tripadvisor.com/Hotel_Review-g33388-d83061-Reviews-Motel_6_Denver_Central_Federal_Boulevard-Denver_Colorado.html.
[54] https://www.yelp.com/biz/motel-6-dallas-4.

get my drift, and when i called the front desk they said they would check it out and never did…"[55]

- 2012 TripAdvisor review from Illinois states "……They had pimps and prostitution going on next door, under and across from me my whole week hear. I told front desk of the noise and loud banging they were making all day and night long. The front desk called one room where they were in the prostitute got rude with her you can hear it they were told to check out but the same day they checked back in next door to me. Staff here must be in on it some how cause I watched a pimp and a few underage girls go in and out a few rooms across and next to me all night long with custermers. The following morning around 5am I was woken to a girl in the hall yelling at the pimp who just hit her. It gets better I guess staff told them I made a complaint so then after they were banging on my door and getting rooms next to me as well making extreme noise so they can get me out..."[56]

- 2013 TripAdvisor review from New York states "If you like drugs and drug addicts and drug dealing and prostitutes, this is the place to go. Not only do these people live in the hotel and use it as a place of business, but some of the staff is involved in drug dealing as well…"[57]

- 2013 Yelp Review from Seatac, WA states "Had business in Seattle so I was only staying one night. I'm not from the area, so I didn't realize the location is within a virtual "red light district". After checking in, I pulled up to a parking spot near my room and was immediately stared down by a charming African-American gentleman who approached my car with the intention of probably other than asking for directions. Once he saw how big I was, he backed off and started walking the other way. I walked up to the non-operating keycard security door (complete with cracked glass and "caution" tape across it), and in the hallway was passed by a couple of, you guessed it, more charming individuals! (ladies, this time..the kind who appeared to be "on the clock") They, too, stared me down, and I continued to my room. The room appeared to be updated --- the only part of this stay that went right. AVOID THIS PLACE unless you are a crackhead, meth freak, prostitute or are looking to be violated in some way. I honestly can't believe this passes for a motel, as the majority of the people wandering the halls during my stay were DEFINITELY there for reasons other than just needing a place to stay." [58]

[55] https://www.yelp.com/biz/motel-6-escondido?start=60.
[56] https://www.tripadvisor.com/Hotel_Review-g36052-d243950-Reviews-Motel_6_Chicago_North_Glenview-Glenview_Illinois.html.
[57] https://www.tripadvisor.co.nz/Hotel_Review-g29810-d93070-r172297063-Motel_6_Amherst_NY_Buffalo-Amherst_New_York.html.
https://www.yelp.com/biz/motel-6-seattle-seattle.
[58] https://www.yelp.com/biz/motel-6-seattle-seattle.

- 2014 Trip Advisor Hotel Review from Bend, OR states "….. Busted a male smoking pot, in front of my window when I have my 2 smallkids in room sleeeping. Not to mention prostitutes all around. Never will I stay again"[59]

- 2014 Yelp Review from Pheonix, AZ states "I am unfortunately living near to this hotel from hell, so everything I am about to write comes from being around this festering house of prostitution and meth 24/7.If there was ever a place you don't want to be around, it is this place, a towering achievement to the owners looking the other way, or taking money under the table from the drug dealers and pimps that crawl on this place from tile to water marked ceiling. From the swat teams busting down doors, to the loud fist fights in broken English nightly this place deserves to be torn down and a marker for each life lost in the parking lot or room placed as reminder of what went on there. It is a blight on the world. Do not under any circumstances stay there, not even in the parking lot. There has been multiple people shot in the parking lot from competitors and police alike. There are almost monthly raids that seem to do nothing to deter the crime that goes on at all times of the night and day. It spills into the surrounding houses and businesses that surround this motel from hell. If you doubt me in any way a quick look on the net for this address will lead you to news tidbits about the theft rings based out of the rooms, the human traffic, the prostitution and gruesome murders, the severed body parts of people lured into the motel for some hanky panky via craigslist. It is legend in this neighborhood and it has lost it's shock value after 10 years of living around it. Nothing good can come of this place, not even a good nights sleep. That is a guarantee. If you are reading this in the parking lot before entering, you have been warned my poor hapless traveler. This place is death. Ever wanted to see a hooker walk around in hot pants and a feather boa just like on TV? Ever wanted to see someone get killed in broad daylight and scream out their last breath to a fleeing crowd of onlookers intent on keeping their drugs safe and sound? Well just come on over and rent a room. This place is a curiosity for thrill seekers and the foolish looking for blood or prison. Avoid this place like the plague!!There are no less than two "work today get paid today" agencies based out of this hotel, it attracts all of the drug addicts and sex offenders in the area. I receive about 2-3 sex offender fliers in my mail each month and it is always listing this motel as where they are staying."[60]

- 2014 Trip Advisor Review from Charleston, SC states "My 2 Friends and I can down for a girls vacation. We found this hotel on a app and being 3 college kids, saving money is a must! Who could turn down a $54 room? Right, well when we got there first they sent us to a room that wasn't even clean. A hotel staff was up on the floor walking around talking to the gang of men on the walkway, she then took is to another room. As we was walking away………… men made very inappropriate comments about us, about what they would like to do to us! And the staff just laughed about it like it wasn't a big deal. We was terrified by the time we

[59] https://www.tripadvisor.com/Hotel_Review-g51766-d244139-Reviews-Motel_6_Bend-Bend_Central_Oregon_Oregon.html.
[60] https://www.yelp.com/biz/motel-6-phoenix-8.

returned to my car I was in a full blown panic attack! ………. the guys and the rude sexual comments, the men drinking 40's (beer) in the parking lot blaring hip-hop music from their cars, grills in the parking lot like people lived their, possible prostitution and a drug dealing we actually witnessed…… We refused to stay in such conditions especially when we feared the walk from our car to our room! Stay away from this place, it may have a good low price but it's so not worth it!"[61]

- June 2018 Trip Advisor Review states "…………………. Very sketchy people everywhere, pretty sure I saw a escort lady walking around the parking lot and lot of people who like meth."[62]
- August 2020 Expedia Review from Omaha, NE states "Guys, it's just in a bad area. A really bad area. There was blatant drug activity and prostitution going on…….They weren't the problem, the clientele was the problem."[63]
- June 2021 Expedia Review from Omaha, NE states ……….. We paid 110 dollars a night to be afraid of going out after dark because there were transients,hookers,and drug addicts both wandering the property and renting the rooms.[64]

63. These and other news stories, guest surveys, and online reviews show that the use of G6 and Motel 6 hotels for sex trafficking was not isolated to one hotel property or a single geographic area. The common use of G6 and Motel 6 hotels for sex trafficking became a nationwide problem that stemmed from decisions made at the corporate/franchisor level.

64. Each Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Motel 6 branded hotels, including the Subject Motel 6, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the Subject Motel 6 frequently and long after the trafficking of Jane Doe (J.A.S.).

---

[61] https://www.tripadvisor.com/Hotel_Review-g54370-d97550-Reviews-Motel_6_Charleston_North-North_Charleston_South_Carolina.html
[62] https://www.tripadvisor.com/Hotel_Review-g60885-d91492-Reviews-Motel_6_Omaha-Omaha_Nebraska.html
[63] https://www.expedia.com/Omaha-Hotels-Motel-6-Omaha.h1184821.Hotel-Reviews
[64] https://www.expedia.com/Omaha-Hotels-Motel-6-Omaha.h1184821.Hotel-Reviews

65. This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (J.A.S.) was trafficked at the subject property, the G6 Defendants knew or should have known that:

a. There was widespread and ongoing sex trafficking occurring at Motel 6 branded properties;

b. Sex trafficking was a brand-wide problem for Motel 6 originating from management level decisions at their corporate offices in Carrollton, Texas;

c. Motel 6 franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

d. Motel 6's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

e. Motel 6 and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

66. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, the G6 Defendants did not change course. The G6 Defendants chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

**b. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Motel 6 location.**

67. The G6 Defendants and Franchisee Defendant were specifically aware that sex trafficking was widespread and ongoing at the Subject Motel 6 location.

68. The G6 Defendants knew or should have known about the sex trafficking pervasive at the Subject Motel 6 based on obvious indicators of this activity.

69. Internet reviews for the Subject Motel 6 location, which upon information and belief the G6 Defendants manage and monitor, confirm the presence of criminal activity associated with sex trafficking at the Subject Motel 6. For example:

- A 2015 Google review states: “This place sucks! It has fleas or bed bugs or something. We asked for our money back. Oh yeah, and it is drug infested. A deal was going down a few doors down and right by registration office.”[65]

- A 2016 Yelp review states: “One word folks.... GHETTO GHETTO GHETTO GHETTO GHETTO GHETTO.... It's called the Motel 6, when it should be called THE MOTEL NEGATIVE 6. I wish I would have read this page before we paid to stay here. The room is filthy like a prostitutes vagina that hasn't been cleaned for 6 long work days. I though there was feces on the fridge but it was just rusted. Crack pipe burns in the sheets, skid marks on the back on the toilet bowl. The best thing I can tell you is to stay the hell away from this place, unless ur looking for drugs and/or to hire a girl for and hour or to..... A little message to the owners, KNOCK THE BULIDING DOWN AND START ALL OVER AGAIN FROM GROUND UP! You cheap bastards!!”[66]

- A 2017 Google review states: “Drugs ,prostitution ,crime and security was a druken pervert.”[67]

- A July 2018 Google review states: “Very seedy loxation. Doors,always locked in Office. High crime area. Lots of Prostitutes. Never stay there again.”[68]

---

[65] https://www.google.com/travel/hotels/Motel%206%202820%20Chamblee%20Tucker%20Rd,%20Atlanta,%20GA%2030341%20google/entity/CgsIp53nu6znrovtARAB/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4754388,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4906023,4926165,4926489,4927883,4927885,4930751,4930753,4931360,4936396,4937897,4938634,4938636,47061553&hl=en-RO&gl=ro&ssta=1&q=Motel+6+2820+Chamblee+Tucker+Rd,+Atlanta,+GA+30341+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGAwSBwjnDxACGA0gADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg4ZjUwODI5NGY0MGEyMWQ6MHhlZDE2YmIzYWM3NzljZWE3&rp=EKed57us566L7QEQp53nu6znrovtATgCQABIAcABAg&ictx=1

[66] https://www.yelp.com/biz/motel-6-chamblee-atlanta

[67] https://www.google.com/travel/hotels/Motel%206%202820%20Chamblee%20Tucker%20Rd,%20Atlanta,%20GA%2030341%20google/entity/CgsIp53nu6znrovtARAB/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4754388,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4906023,4926165,4926489,4927883,4927885,4930751,4930753,4931360,4936396,4937897,4938634,4938636,47061553&hl=en-RO&gl=ro&ssta=1&q=Motel+6+2820+Chamblee+Tucker+Rd,+Atlanta,+GA+30341+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGAwSBwjnDxACGA0gADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg4ZjUwODI5NGY0MGEyMWQ6MHhlZDE2YmIzYWM3NzljZWE3&rp=EKed57us566L7QEQp53nu6znrovtATgCQABIAcABAg&ictx=1

[68] https://www.google.com/travel/hotels/Motel%206%202820%20Chamblee%20Tucker%20Rd,%20Atlanta,%20GA%2030341%20google/entity/CgsIp53nu6znrovtARAB/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4754388,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4906023,4926165,4926489,4927883,4927885,4930751,4930753,4931360,4936396,4937897,4938634,4938636,47061553&hl=en-RO&gl=ro&ssta=1&q=Motel+6+2820+Chamblee+Tucker+Rd,+Atlanta,+GA+30341+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGAwSBwjnDxACGA0gADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg4ZjUwODI5NGY0MGEyMWQ6MHhlZDE2YmIzYWM3NzljZWE3&rp=EKed57us566L7QEQp53nu6znrovtATgCQABIAcABAg&ictx=1

- A 2018 Google review states: "Absolutely no amenities, exposed wiring, dirty shower, toilet loose on floor. USED AND BLOODY CONDOM IN NIGHTSTAND. Front Office locked and unattended for an hour and 15 minutes in the morning. Horrible experience. Rude night clerk."[69]

70. Defendants knew that a population of traffickers, including Jane Doe (J.A.S.)'s trafficker, repeatedly chose to use the Subject Motel 6 for their sex trafficking activity. They selected these hotels because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Subject Motel 6. There were obvious signs of this activity, which were consistent with the well-known "red flags" for sex trafficking in the hospitality industry. As such, Defendants also knew or should have known about the pervasive sex trafficking at the Subject Motel 6 based on obvious indicators of this activity.

71. This population of traffickers, including (J.A.S.)'s trafficker, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

72. Upon information and belief, there were other victims being trafficked at the Subject Motel 6 at the same time as (J.A.S.) and there were obvious signs these victims were being trafficked.

---

[69] https://www.google.com/travel/hotels/Motel%206%202820%20Chamblee%20Tucker%20Rd,%20Atlanta,%20GA%2030341%20google/entity/CgsIp53nu6znrovtARAB/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4754388,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4906023,4926165,4926489,4927883,4927885,4930751,4930753,4931360,4936396,4937897,4938634,4938636,47061553&hl=en-RO&gl=ro&ssta=1&q=Motel+6+2820+Chamblee+Tucker+Rd,+Atlanta,+GA+30341+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGAwSBwjnDxACGA0gADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg4ZjUwODI5NGY0MGEyMWQ6MHhlZDE2YmIzYWM3NzljZWE3&rp=EKed57us566L7QEQp53nu6znrovtATgCQABIAcABAg&ictx=1

73. Based upon information and belief, the conduct of Defendants facilitated the trafficking of a number of victims by a population of multiple traffickers at the Subject Motel 6. Defendants developed a continuous business relationship with this population of traffickers who operated at the hotel on a routine and repetitive basis.

74. Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Subject Motel 6 location named herein prior to Jane Doe (J.A.S.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

75. All knowledge from the staff at the Subject Motel 6 is imputed to Franchisee Defendant. Franchisee Defendant knew about this widespread and ongoing trafficking at these Motel 6 locations, including the trafficking of Jane Doe (J.A.S.), through the direct observations of hotel staff, including management-level staff.

76. Upon information and belief, both the G6 Defendants and Franchisees knew or should have known about the widespread trafficking at the Subject Motel 6 location referenced herein, based on:

a. The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

b. The Defendants' regular monitoring of online reviews;

c. The Defendants' collection and monitoring of customer surveys and complaints;

d. The Defendants' regular inspections of the hotel property;

e. Information provided to Defendants by law enforcement; and

f. Other sources of information available to Defendants.

77. Upon information and belief, the G6 Brand Defendants knew or should have known about the widespread trafficking at the Subject Motel 6 based on:

a. The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

b. The Defendants' regular monitoring of online reviews;

c. The Defendants' collection and monitoring of customer surveys and complaints;

d. The Defendants' regular inspections of the hotel property;

e. Information provided to Defendants by law enforcement; and

f. Other sources of information available to Defendants.

78. Upon information and belief, under the G6 Defendants' protocols, which on their face required hotel staff and management to report suspected criminal activity to the G6 Defendants, hotel staff and management were required to report numerous instances of suspected sex trafficking to the G6 Defendants prior to Jane Doe (J.A.S.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Subject Motel 6.

79. Upon information and belief, the G6 Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the Subject Motel 6 based on their supervision and monitoring of the property.

**c. Defendants knew the venture that resulted in Jane Doe (J.A.S.)'s trafficking was operating at the Subject Motel 6 location because of the apparent and obvious "red flags" of sex trafficking.**

80. During the period that Jane Doe (J.A.S.) was trafficked at the Subject Motel 6 location named herein, there were obvious signs that her traffickers were engaged in sex trafficking:

a. The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards;

b. Other girls were trafficked at the same hotel at the same time as Jane Doe (J.A.S.);

c. Even though Jane Doe (J.A.S.) and her traffickers would stay for multiple days at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger;

d. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services;

e. The trafficker was often present with Jane Doe (J.A.S.) at check in and would linger around the hotel or in the parking lot while she was with a john;

f. There was heavy foot traffic in and out of Jane Doe (J.A.S.)'s room involving men who were not hotel guests;

g. Jane Doe (J.A.S.) would hint to the hotel staff that she was being trafficked and shared details regarding the dates with them;

h. Jane Doe (J.A.S.) was forced to see at least 5 johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

i. Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

81. Based upon information and belief, multiple employees at the Subject Motel 6, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

82. As such, the G6 Defendants and Franchisee Defendant knew or was willfully blind to the fact that Jane Doe (J.A.S.) was being trafficked at the Subject Motel 6.

83. Given these obvious signs, the G6 Defendants and Franchisee Defendant knew or should have known about the trafficking of Jane Doe (J.A.S.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

## IV. Defendants actively facilitated sex trafficking at the Subject Motel 6, resulting in the trafficking of Jane Doe (J.A.S.).

84. G6 and Franchisee Defendant had both actual and constructive knowledge of the trafficking of Jane Doe (J.A.S.) at these Motel 6 locations because the trafficking was the direct result of G6 and Franchisee Defendant facilitating her trafficking at the Subject Motel 6.

### a. Franchisee Defendant facilitated the trafficking of Jane Doe (J.A.S.).

85. The Franchisee Defendant is responsible for the acts, omissions, and knowledge of all employees of their Motel 6 locations when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Franchisee Defendant ratified these acts and omissions, and because Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendant, of sex trafficking occurring at these Motel 6 branded locations including the Subject Motel 6.

86. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Motel 6 location, Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

87. Franchisee Defendant knew or was willfully blind to the fact that Jane Doe (J.A.S.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (J.A.S.)'s sexual exploitation.

88. Franchisee Defendant also facilitated widespread trafficking at their Subject Motel 6 location, including the trafficking of Jane Doe (J.A.S.), in ways including:

a. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**b. The G6 Defendants facilitated the trafficking of Jane Doe (J.A.S.).**

89. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Motel 6 that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (J.A.S.), as follows:

a. The G6 Defendants have publicly assumed responsibility and control over the human trafficking response of all Motel 6 properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

b. The G6 Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 branded hotels;

c. The G6 Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the G6 Defendants. The G6 Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

d. The G6 Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

e. The G6 Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

f. The G6 Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The G6 Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

g. Although they delayed making any reasonable effort to do so, the G6 Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

h. The G6 Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Motel 6 properties, including suspected trafficking incidents;

i. The G6 Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject Motel 6 location;

j. The G6 Defendants maintained control over all details of the terms under which franchised hotels, including the Subject Motel 6 location, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The G6 Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject Motel 6 location;

k. The G6 Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Subject Motel 6 location, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

l. The G6 Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject Motel 6 location, including trends that would reveal patterns consistent with human trafficking.

90. G6 directly participated in and retained day-to-day control over renting rooms at the Subject Motel 6 location by, among other things:

a. The G6 Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. The G6 Defendants directly made reservations for rooms at the Subject Motel 6 location and accepted payment for those rooms through a central reservation system that they controlled and operated. The G6 Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

c. The G6 Defendants established and maintained control over a brand-wide "do not rent" system. The G6 Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject Motel 6 location through detailed policies that it established regarding use of this "do not rent" system;

d. The G6 Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

e. The G6 Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f. The G6 Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g. The G6 Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Motel 6 location;

h. The G6 Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Motel 6 location until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i. The G6 Defendants required franchisees to use G6's property management system, which was owned, maintained, controlled, and operated by the G6 Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

91. The G6 Defendants had a direct business relationship with traffickers operating at the Subject Motel 6 because, among other things, the G6 Defendants directly rented rooms at the hotels, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with the G6 Defendants by developing brand loyalty and intentionally choosing Motel 6 hotels because it was known they created a favorable environment for trafficking.

92. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Motel 6, the G6 Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (J.A.S.).

93. The G6 Defendants knew or should have known that Jane Doe (J.A.S.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing them hotel rooms and related services to facilitate Jane Doe (J.A.S.)'s sexual exploitation.

94. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Motel 6, the G6 Defendants continued participating in a venture at these hotels, with its franchisees and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

a. The G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

b. The G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

c. The G6 Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties;

d. The G6 Defendants implicitly approved decisions by franchisees and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

e. The G6 Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Subject Motel 6 location;

f. The G6 Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the Subject Motel 6 location, the G6 Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

h. The G6 Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

i. The G6 Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j. The G6 Defendants provided traffickers with access to internet services in a manner that the G6 Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

95. If the G6 Defendants had exercised reasonable diligence when operating their Motel 6 properties and in the areas where it retained control, the G6 Defendants would have prevented the Subject Motel 6 from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (J.A.S.). Instead, the G6 Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (J.A.S.).

96. The G6 Defendants should have known about (J.A.S.)'s trafficking because it retained control over the training of the staff of the Subject Motel 6 regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If the G6 Defendants had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking, including the trafficking of (J.A.S.) at the Subject Motel 6. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the G6 Brand Defendants.

97. The G6 Defendants should have known about (J.A.S.)'s trafficking because they also retained control over the response of the Subject Motel 6 and its other locations to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this

duty, the G6 Defendants facilitated sex trafficking, including the sex trafficking of (J.A.S.) in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the G6 Defendants.

98. The G6 Defendants also should have known about (J.A.S.)'s trafficking because they retained the control to adopt and enforce policies on sex trafficking for their properties, including the Subject Motel 6, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at the Subject Motel 6. The G6 Defendants and allowed traffickers to access rooms for the purpose of harboring their victims, including (J.A.S.). Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the G6 Defendants.

99. The G6 Defendants also should have known about (J.A.S.)'s trafficking because they retained control over the security of the Subject Motel 6 through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting the Subject Motel 6. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the G6 Defendants had used reasonable prudence in monitoring and reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the G6 Defendants.

100. Jane Doe (J.A.S.) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the G6 Defendants had used reasonable diligence in the aspects of hotel operations over which they retained control.

101. Moreover, (J.A.S.)'s traffickers were able to operate without interference and without making significant effort at a concealment during repeated visits to the Subject Motel 6 over an extended period because the G6 Defendants adopted policies and practices that insulated (J.A.S.)'s trafficker from significant risk of detection or disruption.

**V. Defendants' ventures at the Motel 6.**

102. Through the conduct described above, G6 and Franchisee Defendant knowingly benefited from engaging in a venture with sex traffickers at the Subject Motel 6 location named herein, including Jane Doe (J.A.S.)'s traffickers, as follows:

a. G6 Defendants and Franchisee Defendant both received benefits, including increased revenue, every time a room was rented at any Motel 6 location;

b. This venture engaged in violations of 18 U.S.C. §1591 through the actions of the criminal traffickers at the Motel 6 locations, which G6 defendants and Franchisee Defendant knew or should have known about;

c. G6 Defendants and Franchisee Defendant associated with traffickers, including Jane Doe (J.A.S.)'s trafficker, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity;

d. G6 Defendants and Franchisee Defendant had a mutually beneficial relationship with the traffickers at the Motel 6 locations, fueled by sexual exploitation of victims, including Jane Doe (J.A.S.);

e. Sex traffickers, including Jane Doe (J.A.S.)'s trafficker, frequently used the Motel 6 locations for their trafficking because of an implicit understanding that the Motel 6 locations were an avenue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of G6 Defendants and Franchisee Defendant facilitating that trafficking as described throughout this Original Complaint. This resulted in benefits, including increased revenue, for G6 Defendants and Franchisee Defendant;

f. Both G6 Defendants and Franchisee Defendant participated in this venture through the conduct described throughout Plaintiff's Original Complaint, as they were jointly responsible for relevant aspects of hotel operations; and

g. Jane Doe (J.A.S.)'s trafficking at the Subject Motel 6 was a result of G6 Defendants and Franchisee Defendant's participation in a venture with criminal traffickers. If

G6 and Franchisee Defendant had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (J.A.S.)'s trafficking at the Subject Motel 6.

## VI. Defendants are Jointly and Severally Liable for Jane Doe (J.A.S.)'s Damages.

103. The G6 Defendants and Franchisee Defendant were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

104. Upon information and belief, operation of the subject property was part of a single unified operation by G6 Brand Defendants and Franchisee Defendant. Upon information and belief, all G6 Defendants and the Franchisee Defendant shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, G6 Defendants and Franchisee Defendant acted jointly to own, operate, control, manage, and supervise the subject property. As an integrated enterprise and/or joint venture, G6 Defendants and Franchisee Defendant were separately and jointly responsible for compliance with all applicable laws.

105. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (J.A.S.).

106. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (J.A.S.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

107. Jane Doe (J.A.S.) incorporates all previous allegations.

## I. Count 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendant)

108. Jane Doe (J.A.S.) is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

109. Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because Franchisee Defendant:

a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (J.A.S.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

110. Violations of 18 U.S.C §1595(a) by Franchisee Defendant as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (J.A.S.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**II. Count 2: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

111. Jane Doe (J.A.S.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

112. Through acts and omissions described throughout this Complaint, G6 Defendants and Franchisee Defendant received a financial benefit from participating in a venture with traffickers, including Jane Doe (J.A.S.)'s trafficker, despite the fact that each defendant knew or

should have known that these traffickers, including Jane Doe (J.A.S.)'s trafficker, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, G6 Defendants and Franchisee Defendant are liable as a beneficiary under 18 U.S.C §1595(a).

113. Through the acts and omissions described throughout this Complaint, G6 Defendants received a financial benefit from participating in a venture with its respective franchisees regarding the operations of its respective hotel properties even though G6 Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

114. Violations of 18 U.S.C §1595(a) by G6 Defendants and Franchisee Defendant as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (J.A.S.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

## III. Count 3: Vicarious Liability for TVPRA Violations (Franchisor Defendants).

115. Franchisee Defendant acted as the actual agent of its respective G6 Defendants when operating its respective hotel property.

116. Through the acts and omissions described throughout this Complaint, G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisees to operate its respective hotel property.

117. Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

118. G6 Defendants are vicariously liable for the TVPRA violations of its franchisees and the subagents of that franchisee.

119. As alleged above, G6 Defendants are directly liable to Jane Doe (J.A.S.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under

18 U.S.C §1595(a). Franchisee Defendant is also directly liable to Jane Doe (J.A.S.) under § 2255. G6 is vicariously liable to Jane Doe (J.A.S.) for those same violations.

**DISCOVERY RULE**

120. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (J.A.S.) invokes the discovery rule. At the time she was harmed and through at least December 2016, Jane Doe (J.A.S.) was under coercion and control of traffickers who abused and manipulated her. Thus, Jane Doe (J.A.S.) did not discover and could not reasonably have discovered the legal cause of her injuries more than ten years before she filed this lawsuit. While she was under the control of her traffickers, Jane Doe (J.A.S.) —through no fault of her own—lacked the information to bring claims because she did not know both her injuries and the cause of her injuries. This lack of information was due to no fault on the part of Jane Doe (J.A.S.) but rather was a direct result of Jane Doe (J.A.S.) being kept under the control of her traffickers, which Defendants facilitated.

121. At the time Jane Doe (J.A.S.) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injuries arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injuries, more than ten years before suit was filed.

122. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (J.A.S.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (J.A.S.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from pursuing her legal remedies including but not limited to the filing of a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (J.A.S.) filed this lawsuit.

123. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (J.A.S.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

124. Jane Doe (J.A.S.) was subject to continuous trafficking at the Subject Motel 6 location through at least December 2015, which is not more than 10 years before Jane Doe (J.A.S.) filed this lawsuit.

125. This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the Subject Motel 6 location named herein and Defendants' ongoing venture with one another and with criminal traffickers.

## DAMAGES

126. G6 Defendants and Franchisee Defendant's acts and omissions, individually and collectively, caused Jane Doe (J.A.S.) to sustain legal damages.

127. G6 Defendants and Franchisee Defendant are joint and severally liable for all past and future damages sustained by Jane Doe (J.A.S.).

128. Jane Doe (J.A.S.) is entitled to be compensated for personal injuries and economic damages, including:

a. Actual damages (until trial and in the future);

b. Incidental and consequential damages (until trial and in the future);

c. Mental anguish and emotional distress damages (until trial and in the future);

d. Lost earnings and lost earning capacity (until trial and in the future);

e. Necessary medical expenses (until trial and in the future);

f. Life care expenses (until trial and in the future);

g. Physical pain and suffering (until trial and in the future);

h. Physical impairment (until trial and in the future);

i. Exemplary/Punitive damages;

j. Attorneys' fees;

k. Costs of this action; and

l. Pre-judgment and all other interest recoverable.

**JURY TRIAL**

129. Jane Doe (J.A.S.) demands a jury trial on all issues.

**RELIEF SOUGHT**

130. WHEREFORE, Jane Doe (J.A.S.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (J.A.S.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (J.A.S.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

*/s/ Annie McAdams*
**ANNIE MCADAMS PC**
Annie McAdams | SBN 24051014
2900 North Loop West
Suite 1130
Houston Texas 77092
(713) 785-6262
(866) 713-6141 Facsimile
*annie@mcadamspc.com*

and

*/s/ David Harris*
**SICO HOELSCHER HARRIS, LLP**
David E. Harris | SBN 24049273
Luis O. Sanchez | SBN 24130926

819 N. Upper Broadway
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
*dharris@shhlaw.com*
*lsanchez@shhlaw.com*

**ATTORNEYS FOR PLAINTIFF**